# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Russell P. Price, Jr., | : | Case No. 1:08CV2804 |
| | : | |
| Petitioner | : | Judge Solomon Oliver, Jr. |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Richard Hall, Warden, | : | |
| | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Respondent | : | |

In this pro se action in habeas corpus, 28 U.S.C. §2254, petitioner challenges the constitutionality of his December 11, 2006 conviction pursuant to a jury trial of one count of illegal manufacture of drugs (methamphetamines) in a public place, upon which he is serving a sentence of seven years incarceration.

Petitioner's conviction arose consequent to police having entered his hotel room on the evening of September 25, 2005 at the Legacy Inn located in Wadsworth, Ohio, after which items were seized leading to a determination that he and his female companion had engaged in the manufacture of methamphetamine, otherwise referred to as a "meth lab."

Petitioner filed a motion to suppress[1] and motion in limine to exclude from trial "all

---

[1]The original motion was filed on November 10, 2005 and then amended on February 16, 2006.

evidence...which was obtained as a result of Defendant's arrest, interrogation, and the search of his person, motor vehicle, and hotel room, including all statements and evidence obtained as a result of such arrest, search and interrogation."   A suppression hearing was conducted on February 17 and June 1, 2006, during which the trial court summarized the matter before him as follows:

> MR. RAZAVI:  I think at some point the door is open, they have a consensual encounter in the room.
>
> THE COURT: I understand all that, I understand that is your theory, but at some point also an affidavit is given to Judge McIlvaine, and the question then becomes whether or not that affidavit was factually correct.
>
> MR. RAZAVI: Your Honor, I don't want to, as we say, slice the baloney too thin.  When Price opened the door, Ptl. Sipos could see more, actually after Price opened the door, at some point she did see in plain view, more correctly, Officer Blubaugh saw it in plain view.
>
> THE COURT: No, here is what would be more accurate.  After Mr. Price opened the door, his identity was confirmed, he was arrested, then Ptl. Sipos went in the room, then Ptl. Sipos observed the following items that could be used in the manufacture of methamphetamines, that would be the most correct thing.
>
> I think the impression that affidavit gave, whether intentionally or unintentional, I don't know what Judge McIlvaine thought because I am not Judge McIlvaine.
>
> If I was reading that affidavit, and I was a Judge being asked to give the warrant, I would agree the officer saw it from the doorway.
>
> She said she couldn't see it from the doorway.
>
> MR. RAZAVI: I think the case law makes the distinction

2

whether they were intentional.

THE COURT: The additional issue whether there is probable cause to believe there is illegal items there, if it met the standard of a Constitutional observation.

I don't believe that is the main inquiry he is making, so I don't know how significant that would be.

I think that is for a later Court.

* * * * *

THE COURT: Those [exhibits] are admitted.  I want briefs on the issue – within two weeks, is that enough time?

MR. HOLLAND: Yes, Your Honor.

THE COURT: Whether or not in the execution of an arrest warrant a police officer has the right to go into a room after the person has been arrested, in a motel to secure the room or talk to other occupants of the room.

In my way, that is the preliminary question.

I believe if the Officer had the right to do that, then the affidavit, while perhaps unartfully drawn, may not be misleading at all.

If they didn't have the right to do that, if she didn't have the right to do that, then the affidavit may be misleading.

That is the question.

The trial court denied the motion on June 14, 2006, holding that although there were misleading statements in the affidavit relied upon for issuance of the search warrant those statements were not intentionally or recklessly misleading:

Mr. Price filed a motion to suppress evidence obtained pursuant to a search warrant that was issued by Judge McIlvaine of the

3

Wadsworth Municipal Court.  He also moved this Court to suppress evidence that was obtained from him when he made various statements to the police following his arrest.

The basis of Mr. Price's motion as far as the search warrant is concerned is that certain statements were made in the affidavit supporting the issuance of the search warrant that were not true. In an earlier entry this Court held that Mr. Price was entitled to a hearing on the issue of whether the Wadsworth Detective who executed the search warrant intentionally made misleading or false statements in the affidavit.

Pursuant to that holding, a hearing was conducted on that issue. Based on that hearing, the Court makes the following findings:

In the affidavit there appears the following language in the paragraph numbered "4": "When Price opened the door, Ptl. Sipos could see in plain view items known to be used in the manufacture of methamphetamine."  That statement is incorrect and misleading.  The import of the statement is that Ptl. Sipos could see from the open door of the motel room items used in the manufacture of methamphetamine.  That is not true.

As Ptl. Sipos testified, she could not see the items until she went into the room to talk to a woman who was with Mr. Price. Before she went into the room, Mr. Price had been arrested on a warrant out of Summit County and was in custody.  After Mr. Price had been taken away, Ptl. Sipos then entered the room and talked to the woman and saw the items referred to in paragraph number "4".

If the only issue was whether the affidavit contained misleading statements, this finding would end the inquiry.  The issue, however, isn't whether the detective executing the affidavit put misleading statements in the affidavit, the issue is whether he *intentionally or recklessly* made misleading statements.[1]

_____

[1] In <u>Franks v. Delaware</u> (1978), 438 U.S. 154, 57 L.Ed.2d 667, 98 S.Ct. 2674, the United States Supreme Court held that HN4 evidence seized pursuant to a warrant must be excluded if the defendant establishes, by a preponderance of the evidence, that the affidavit supporting the warrant contained intentionally or

> recklessly false statements, without which the affidavit would not support a finding of probable cause.
>
> _____
>
> In this case, Ptl. Sipos testified that she gave a verbal report to the detective who was preparing the affidavit.  That detective did not testify.  This Court finds that Mr. Price has not established by a preponderance of the evidence that the statement in paragraph number "4" was either intentionally misleading or that the detective was reckless in that regard.  Consequently, the motion to suppress is denied on those ground. [sic]

On July 25, 2006 and then again on October 17, 2006, the petitioner filed motions to dismiss the charges against him, alleging speedy trial violations, but those motions were denied on October 18, 2006.  Petitioner, acting pro se, appealed the denial of the first motion to dismiss, and the appellate court dismissed it as an interlocutory appeal.

Prior to that ruling, on September 25, 2006 Judge James Kimbler, the trial judge which had presided previously, recused himself from the case.  The case was then transferred to the docket of Judge Christopher Collier.

On November 27, 2006 the petitioner moved for an additional suppression hearing, arguing that there were "legal issues of a constitutional nature" which remained "unresolved" after the first suppression hearing, a proposition which he supported with pages 38-42 of the transcript of the earlier suppression hearing.

Trial commenced on December 11, 2006, but immediately before trial the judge stated on the record that after reviewing the suppression hearing transcript and the prior judge's order he found no remaining unresolved suppression issues, all issues having been adequately resolved by his predecessor.

The petitioner appealed his convictions to the Ohio Ninth District Court of Appeals, alleging the following four assignments of error:

I.   The evidence at trial was insufficient to support the jury's guilty verdict and the convictions therefore were against the manifest weight of the evidence.

II.  The Court erred when it imposed more than a minimum sentence for the offense for which the defendant was convicted.

III. The Court erred when it denied defendant's motion to dismiss based upon his right to a speedy trial.

IV.  The trial court erred when it denied the defendant's motion to suppress the evidence obtained as a result of the illegal warrantless search; the illegal search incident to that entry and the subsequent search and seizure that was based on the invalid/insufficient affidavit for the search warrant.

The facts in petitioner's criminal case were summarized by the state appellate court in pertinent part as follows:

Officer Katie Sipos of the Wadsworth Police Department testified that she was on duty during the evening of September 25, 2005. She testified that she was running license plates in the parking lot of the Legacy Inn, a motel in Wadsworth, Medina County, Ohio, something she did routinely in that high crime area to identify outstanding warrants or illegal activity such as car theft. She testified that the license plate of a car parked in front of room 108 did not match the vehicle or its identification number. She testified that she asked the hotel clerk who was staying in room 108 and discovered that Price had rented the room. She testified that she ran Price's information through the computer and discovered that he had an outstanding felony warrant. She testified that she then called for backup assistance.

Officer Sipos testified that she knocked on the door of room 108 with her flashlight for several minutes. She testified that she recognized Price through the window and yelled for him to come

6

out of the room.  She testified that he came to the door and was taken into custody by one of the officers.  Officer Sipos testified that she then noticed a female sitting on a bed in the room, and she went in to talk with her.  She testified that the female was evasive and deceptive about her identity.

Officer Sipos testified that, while in the room, she noticed Mason jars on a spare bed, a rolled up dollar bill and a small mirror on a nightstand, and some marijuana in an ashtray by the mirror.  She testified that she also noticed some tubing in a trash can.  Officer Sipos testified that she has attended classes to become familiar with products used in the manufacture of methamphetamines.  She testified that the glass jars and tubing are items commonly used in such manufacture.  She testified that she also noticed a chemical smell upon entering the room.

Officer Sipos testified that she determined that the vehicle parked outside the room belonged to the female in the room, eventually identified as Kerry Nelson.  She testified that Nelson gave her the keys to the vehicle and permission to search it.  Officer Sipos testified that she found methamphetamine, coffee filters, a snorting tube with a white powdery residue, Ziploc Baggie-type bags, muriatic acid, and plastic drink bottles.  She testified that Nelson also had some rolling papers and receipts for naphtha and acetone.  She testified that the filters, tubing, bottles, acid, acetone and naphtha were items commonly used in the manufacture of methamphetamine.  Officer Sipos testified that Price asserted that "whatever was in the car he would take a fall for."  She testified that her thought upon seeing these types of items in the room and car was that Price and Nelson "were cooking meth."  She testified that methamphetamine can be smoked, snorted or injected.

Officer James Walser of the Wadsworth Police Department testified that he provides follow-up investigation for cases and logs property in and out of the department property room, including when it is taken to the Bureau of Criminal Investigation ("BCI") for testing.  He identified evidence found at the scene and testified that it was sent to  BCI for testing.

Officer Andrew Blubaugh of the Wadsworth Police Department testified that he arrived at the Legacy Inn in Wadsworth at approximately 11:00 p.m. on September 25, 2005, to assist Officer

Sipos. He testified that he entered room 108 after Officer Sipos had entered to ensure her safety. He testified that during his initial scan of the room, he noticed some suspicious items, including glass jars and tubing attached to a plastic bottle, which his training made him believe was a gas generator used in the production of methamphetamine. He testified that he also noticed an odor in the room.

Officer Blubaugh testified that Officer Sipos found several types of chemicals in Kerry Nelson's car. He testified that the police the called for backup by Medway (a multijurisdictional drug investigation unit) and a Hazmat crew due to the potential danger from the chemicals. He testified that a search warrant was obtained, and that Medway ventilated the area and removed the hazardous chemicals. He testified that he and the other officers then returned to the room and conducted a more thorough search.

Officer Charles DeFelice of the Medway Drug Enforcement Agency testified that he has received extensive training in identifying the manufacture of methamphetamine. He testified that he was called to the Legacy Inn on September 25 and 26, 2005, to "process the scene." He explained that that means rendering the area safe, ventilating the room, and then going through each piece of evidence, specifically, photographing, logging and sampling the evidence. He testified that he took the photographs of the evidence in this case.

Officer DeFelice identified the photographs of the evidence in this case. He testified that the following items were found during the search: a rolled dollar bill and mirror, a gallon jug of muriatic acid, plastic bottles with liquid and residue, a bottle of nail polish remover containing acetone, vials, straws, Ziploc bags, stained coffee filters, a shopping list of chemicals, glass jars, a gas generator made from plastic bottles and tubing, off-white powder, a bottle with saturated matchbook striker plates, naphtha, peroxide, a hot plate, beakers, and receipts for such items.

Officer DeFelice testified as to how these various items would be used in the manufacture of methamphetamine. For example, he testified that matchbook striker plates contain red phosphorous, which is used in one process of manufacturing methamphetamine. He testified coffee filters are used during the extraction of

8

pseudoephedrine pills, specifically to separate the ephedrine from the filler or binding agents in the pills.  In addition, he testified that a gas generator is used to produce hydrochloride gas which causes liquid methamphetamine to crystallize.  Officer DeFelice testified that hot plates are used to speed up the process of evaporation during the extraction of pseudoephedrine or red phosphorous.  He concluded, based on the items seized from room 108 and Nelson's car, that Price and Nelson were using the room as a "meth lab."

Officer DeFelice testified that he observed two processes for the manufacture of methamphetamine being conducted in room 108. First, he testified that Sudafed pills were being dissolved in alcohol in an effort to extract the ephedrine.  He testified that the second on-going process was the extraction of red phosphorous from matchbook striker plates.

Jeffrey Houser of the Ohio Bureau of Criminal Identification and Investigation testified that he analyzes evidence submitted by various police agencies for the presence of controlled substances. He testified that he tested the evidence submitted in this case.  He testified that he  performed two types of tests on the substances submitted and determined that the evidence consisted of several grams of pseudoephedrine, some phosphorous and iodine.  He testified that those substances are used in the manufacture of methamphetamine.  He further testified that some substances submitted in this case were found to contain methamphetamine itself.

Agent Charles Ellis of the Medway Drug Enforcement Agency testified that he has received special training to identify methamphetamine labs.  He testified that he was called to the scene with Officer DeFelice and that they found components consistent with a  methamphetamine lab.

Price presented the testimony of David Fretthold, a forensic toxicologist, who testified regarding the ingredients and process used to manufacture methamphetamine.  He testified that he had seen several "bathtub [methamphetamine] labs" in California.  He testified that he did not believe that the list of items found by Medway contained all items necessary to manufacture methamphetamine.  Specifically, he did not believe that enough

9

iodine was found.  He testified that certain other ingredients which could be used to manufacture methamphetamine had not been found.  He further testified that he was not familiar with the method of soaking matchbook striker plates to remove the red phosphorous.  Rather, he testified that he believed that the phosphorous was commonly collected by scraping or filing it off the striker plates.  He conceded that he supposed that one could remove the phosphorous by soaking it off and then drying it out.  He further conceded that the first step in the production of methamphetamine is the extraction of ephedrine from pills and that that could be accomplished by soaking the pills in some type of liquid.  Mr. Fretthold testified that he did not believe that Price had all the necessary items to complete the process of the manufacture of methamphetamine.  He admitted, however, that he was not saying that Price was not engaged in at least part of the process of the manufacture of methamphetamine.

On May 12, 2008 the state appellate court affirmed the judgment of conviction and sentence, holding that: (1) "The weight of the evidence supports the conclusion that Price knowingly manufactured or engaged in some part of the production of methamphetamine in a public place[;]"

(2) "[T]o the extent that the trial court may have relied upon certain facts which it found relevant, after *Foster*, Price had no right to a jury determination of those facts[;]" (3) the trial court did not err by denying his motion to dismiss based on a violation of his right to speedy trial[;] and (4) the trial court did not err by denying petitioner's motion to suppress evidence, but that the court's review in that regard was limited by reason of petitioner's failure to include the suppression hearing transcript as part of the record on appeal.

Subsequent motions for reconsideration of that decision as it pertained to the failure to submit the suppression hearing transcript as part of the appellate record, as well as attempts to supplement the record, were denied.

10

On June 12, 2008, 2006 petitioner appealed the state appellate court ruling to the Ohio Supreme Court alleging the following three propositions of law:

> **Proposition of Law No. I:** When appellate counsel assigns as error a winning issue of law and fails to provide the reviewing court with the record necessary to allow review of that issue, appellant is denied the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

> **Proposition of Law No. II:** Appellant was denied due process and equal protection of the law when the trial court failed to bring him to trial within the time authorized by statute in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

> **Proposition of Law No. III:** When a trial court disregards mandatory minimum sentencing requirements and fails to justify that sentence on the record defendant is denied due process and equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

On October 1, 2008 the state supreme court denied petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  Petitioner did not appeal this decision to the United States Supreme Court.

On December 1, 2008 the petitioner filed the instant petition, in which he raises the following two claims for relief:

> **A. GROUND ONE**: When appellate counsel assigns as error a winning issue of law and fails to provide the reviewing court with the record necessary to allow review of that issue, appellant is denied the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.

> **B. GROUND TWO:** When a trial court disregards mandatory minimum sentencing requirements and fails to justify that sentence on the record defendant is denied due process and equal protection of the law as guaranteed by the Sixth and

11

Fourteenth Amendment to the United States Constitution.

The provisions of the Antiterrorism and Effective Death Penalty Act, "AEDPA," Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996) are controlling herein as the instant petition was filed after the Act's effective date.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).[2]

While respondent sets out the standard of review to be applied in habeas cases, counsel has not fully explained how that standard is altered in a case such as this, where there is a claim which has been exhausted in the state courts but which has not been "adjudicated on the merits in State court proceedings."

The role of a federal district court in habeas corpus is set forth in Title 28 U.S.C. § 2254 (d) which provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to *any claim that was adjudicated on the merits in State court proceedings* unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(Italics added.)

---

[2] There are no issues of untimeliness in this case.

12

The United States Supreme Court has held that the clauses "contrary to" and "unreasonable application of" as found in §2254(d)(1) have independent meanings; Williams v. Taylor, 529 U.S. 420 (2000), with the state court adjudication being "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court];" and with the state court adjudication involving an "unreasonable application of clearly established Federal law, as determined by the Supreme Court" "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principal from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should apply." 120 S.Ct. at 1519-1520. In deciphering the "unreasonable application" clause this Court must inquire as to whether "the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521. Even if the state court decision resulted in an incorrect application of federal law, if that decision is reasonable it will stand. Id. See, Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000).

In his first claim for relief petitioner alleges that he was denied the effective assistance of appellate counsel as guaranteed by the Sixth Amendment to the United States Constitution, by reason of his counsel's failure to submit the suppression hearing transcript along with the

record to the appellate court.

Where a claim raised in habeas corpus proceedings in federal court has not been "adjudicated on the merits," and there has been no procedural default in the state courts, the claim must be considered de novo, as opposed to applying the more deferential standard enunciated in AEDPA.  Hill v. Mitchell, 400 F.3d 308, 313 (6th Cir. 2005), citing Maples v. Stegall, 340 F.3d 433. 436 (6th Cir. 2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.")

This claim of ineffective assistance of appellate counsel was raised in petitioner's appeal to the state supreme court, which denied petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question, a determination which has been deemed as not having been a decision on the merits.  Rule 8(B), Ohio Supreme Court Rules for the Reporting of Decisions; State v. Davis, 119 Ohio St.3d 422, P25, 894 N.E.2d 1221 (2008).

In addition, the underlying claim of improper denial of petitioner's motion to suppress evidence obtained as a result of a search, which petitioner argues violated his constitutional rights, was raised to each of the state appellate courts.  However, it was not adjudicated on the merits, in light of the fact that the state appellate court which issued the last reasoned decision on this issue held in pertinent part as follows:

> Price argues that the trial court erred by denying his motion to suppress evidence.  This Court disagrees.

> As an initial matter, this Court must address the issues regarding the record on appeal.  App.R. 9(B) states in relevant part:

"At the time of filing the notice of appeal the appellant, in writing, shall order from the reporter a complete transcript or a transcript of the parts of the proceedings not already on file as the appellant considers necessary for inclusion in the record and file a copy of the order with the clerk. *** If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the weight of the evidence, the appellant shall include in the record a transcript of all evidence relevant to the findings or conclusion."

Pursuant to App.R. 12(A)(1)(b), this Court is limited to determining the appeal on the record as provided in App.R. 9.

In this case, Price failed to file a praecipe with the trial court requesting the preparation of a transcript of the suppression hearing.[2] An appellant is responsible for providing this Court with

_____

[2]Price's praecipe to the court reporter, filed January 10, 2007, requests only the preparation of "the entire transcript of the Jury Trial (December 11th and 12th, 2006) and the Sentencing Hearing (December 18, 2006)." A transcript of the suppression hearing was clearly prepared at some time, because Judge Collier asserted that he reviewed it to determine whether any suppression issues were unresolved as of the date of the trial. However, no transcript of any suppression hearing was docketed by the clerk as having been filed in the trial court. Furthermore, no suppression hearing transcripts are contained in the trial court record, except for 5 random pages purportedly from the suppression hearing transcript which Price attached to his motion for a hearing on alleged unresolved issues. Finally, Price did not request the preparation of any suppression hearing transcripts for the purpose of this appeal.

_____

a record of the facts, testimony, and evidentiary matters necessary to support the assignments of error. *Volodkevich v. Volodkevich* (1989), 488 Ohio App.3d 313, 314. Specifically, it is an appellant's duty to transmit the transcript of proceedings. App.R. 10 (A); Loc.R. 5 (A). "When portions of the transcript which are necessary to resolve assignments of error are not included in the record on appeal, the reviewing court has 'no choice but to presume the validity of the [trial] court's proceedings, and

affirm.'" *Cuyahoga Falls v. James,* 9th Dist. No. 21119, 2003-Ohio-531, at ¶9, quoting *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199. Although he cites to a purported transcript of the suppression hearing, Price failed to provide such transcript for purposes of this appeal.

Because the transcript of the suppression hearing is necessary for a determination of Price's fourth assignment of error, this Court must presume regularity in the trial court's proceedings and affirm the judgment of the trial court. See *Knapp*, 61 Ohio St.2d at 199. Price's fourth assignment of error is overruled.

Having failed to file a suppression hearing transcript with the record on appeal, with such failure causing the appellate court to "presume regularity" in the trial court's denial of the suppression motion without considering the merits of petitioner's arguments in that regard, this Court is perplexed as to why a Rule 26(B) application to reopen petitioner's direct appeal was not filed. Under that rule a claim of ineffective assistance of appellate counsel for failure to file the appropriate transcript would have necessitated consideration of "additional material outside the record," and would have warranted filing such transcript to consider the underlying claim in order to assess whether but for counsel's representation the outcome of the appeal would have differed. State v. Davis, 119 Ohio St.3d at P18-P21; Morgan v. Eads, 104 Ohio St.3d 142, P11, 818 N.E.2d 1157 (2004). It could be argued that petitioner still has that remedy available to him, in light of the fact that the rule provides for such an application to be filed "within ninety days from journalization of the appellate judgement," or "at a later time" provided that "the applicant shows good cause" for such untimely filing. In this case, such a showing would be unlikely, considering that in his motion for reconsideration of the appellate court decision petitioner, through counsel, argued that the failure to include the suppression hearing transcript was

16

"obvious oversight," and in its decision denying that request the appellate court noted that petitioner "put[ ] forth no reason for his failure to request a transcript of the suppression hearing. He could easily have included such request in his praecipe in which he requested the trial and sentencing transcripts."  If inadvertence was the reason for failing to request the transcript the reason for filing the Rule 26(B) application to reopen was already known during the ninety day period within which it was to have been filed, and there could be no good cause for untimely filing.  For the purpose of this Court's review in habeas corpus, therefore, this claim for relief is deemed to have been exhausted.

All that having been said, in light of the fact that there has been no adjudication on the merits of this claim for relief, and that it has been exhausted, de novo review of the claim must be undertaken.[3]

A petitioner claiming ineffective assistance of counsel must demonstrate that counsel's conduct was so far below acceptable standards of representation that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution, and that such deficient performance so prejudiced the defense as to render the trial unfair.  Strickland v. Washington, 466 U.S. 668 (1984); Mahdi v. Bagley, 522 F.3d 631, 636 (6th Cir. 2008);  United States v. Bavers, 787 F.2d 1022 (6th Cir. 1985).  Disagreement by a defendant with tactics and/or strategy will not support a claim of ineffective assistance, and a

---

[3]In a case decided days ago, Evans v. Hudson, Case No. 08-3717 (6th Cir. August 3, 2009), the Sixth Circuit Court of Appeals reached the same conclusion as to the standard of review to be applied when a claim of ineffective assistance of appellate counsel is not raised in a Rule 26(B) application to reopen, but instead raised on direct appeal to the state supreme court which denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question, without engaging in the Rule 26(B) analysis undertaken herein.

petitioner in habeas corpus must overcome a presumption that challenged conduct of counsel was a matter of strategy, <u>Strickland</u>, 466 U.S. at 689.  <u>Accord</u>, <u>Wilson v. Yukins</u>, unreported, 1999 U.S.Dist. LEXIS 7644 (E.D.Mich. 1999).   The prejudice prong of the test may be satisfied by a showing that counsel's error deprived the petitioner of a fundamentally fair trial which resulted in a verdict lacking in reliability.  <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986).

The Sixth Amendment right to effective assistance of counsel extends to appellate counsel on direct appeal of a criminal conviction.  <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985).  The Sixth Circuit Court of Appeals has held that:

> In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions. Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation.

<u>McMeans v. Brigano</u>, 228 F.3d 674, 682 (6th Cir. 2000), <u>cert. denied</u>, 532 U.S. 958 (2001) (Citations omitted.).  The proceedings on appeal must be reviewed in order to establish whether prejudice has been shown, i.e., whether "there is 'a reasonable probability that, but for his counsel's [failings]...,[the defendant] would have prevailed on his appeal.'" <u>Mapes v. Tate</u>, 388 F.3d 187, 194 (6th Cir. 2004), <u>quoting</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000).  "Probability sufficient to undermine confidence in the outcome" constituted "reasonable probability." <u>Burton v. Renico</u>, 391 F.3d 764, 773 (6th Cir. 2004); <u>Maples v. Stegall</u>, <u>supra</u> at 437.

Turning to petitioner's claim that his appellate counsel was ineffective by reason of his failure to submit the suppression hearing transcript along with the record to the appellate court,

18

he argues that his claim turns on the notion that the entry of the police into the hotel room by reason of having observed a woman sitting inside violated the Fourth Amendment to the United States Constitution. He claims further that if on appeal of the trial court's denial of his motion to suppress his appellate counsel had included the suppression hearing transcript to the appellate court along with the record a reasonable probability exists that the outcome of the appeal would have been different.

This Court has reviewed the suppression hearing transcript, as well as Judge Kimbler's summary of the suppression hearing testimony made prior to trial, and his findings that although there were misleading statements made in the affidavit for search warrant the issue before him was whether those misleading statements were made intentionally or recklessly. Judge Kimbler found that although it was true that Patrolman Sipos did not actually see from the doorway the items which were the subject of the search she entered the hotel room to secure it for the safety of the officers, questioned the woman who in turn was evasive about her identification, the woman did not object to the officers entering the room, the officers observed items which they believed to be related to illegal drug use/preparation, and then Patrolman Sipos gave a verbal report to a detective who was preparing the affidavit for search warrant, and that detective in turn misstated Patrolman Sipos' ability to view the items from the doorway.

Judge Collier agreed with Judge Kimbler, holding that the statements made in the affidavit were not intentionally or recklessly misleading and that the warrantless entry into the room to question Ms. Nelson was not illegal:

> [T]his Court believes, after a review of the testimony contained in the transcript of proceedings in the case, that there was sufficient

19

> evidence for the officer to walk into the room and ask questions of
> a woman who was in this motel room at the time of the arrest
> of the Defendant in this case, and that once they were in that motel
> room they saw evidence of a meth lab, withdrew, and then got a
> warrant are sufficient for the Court.

This Court agrees with the conclusions of both state trial court judges who ruled on this issue, that consequent to the arrest of petitioner, which occurred pursuant to a warrant, the officers had authority to walk through the threshold of the apartment to question Ms. Nelson and to secure the area, but that they did not have the authority to search the area without a warrant. Aware of that, they withdrew and obtained a warrant to search the room and found the evidence upon which the suppression motion was based.

Although occupants of a hotel room have a reasonable expectation of privacy under the Fourth Amendment, Stoner v. California, 376 U.S. 483, 490 (1964), State v. Brewster, Case Nos. C-030024 and C-030025 (Ct.App. Hamilton County 2004), upon the arrest of petitioner the door to the room was open and Ms. Nelson who sat inside the room did not object when the officers walked through the doorway to question her.  For Fourth Amendment purposes, "There is a recognized difference between consent granted to the police to enter a house to conduct an interview and consent granted to conduct a search."  State v. Schroeder, Case No. WD-00-076, 2001 Ohio App. LEXIS 4786 (Ct. App. Wood County 2001), citing Lakewood v. Smith, 1 Ohio St.2d 128, 205 N.E.2d 388 (1965). Such consent to enter can be express or implied. Ibid. Respondent correctly states in his brief that there was authority in Ohio at the time of the arrest supportive of an implied consent to enter (not to search) based on an open door and no express statement objecting to entry, citing  State v. Cooper, Case No. 21494, 2003 Ohio App. LEXIS

4687, at **5-6 (Ct. App. Summit County 2003); Bainbridge v. Kadseda, Case No. 2007-G-2797, 2008 Ohio App. LEXIS 1843, at **16-20 (Ct. App. Geauga County 2008).[4]

Both the arrest of petitioner and the subsequent search having been pursuant to warrants, and the entry into the room consequent to the search having been proper, this Court finds that there is no evidence that had the suppression hearing transcript been submitted upon appeal that appeal would have been decided differently.  Consequently, petitioner's claim of ineffective assistance of appellate counsel must fail on the merits.

In his second claim for relief the petitioner challenges the sentence imposed by the trial court, which was greater than the minimum prison term, without reliance upon factual findings made by a jury to enhance his sentence under the law, allegedly in violation of the rule of law set out by the United States Supreme Court in Blakely v. Washington, 542 U.S. 296 (2004).  Petitioner argues further that the remedy set forth in State v. Foster, 109 Ohio St.3d 1, 845 N.E.3d 470 (2006), violates the Due Process Clauses of the United States Constitution, in light of the fact that the effect of that decision was to increase the statutory presumptive sentences and to depart from the presumption that offenders without a criminal history would be sentenced to the minimum term.

---

[4]United States v. Mitchell, Case No. 5:07CR0252 (N.Dist. Ohio Jan. 29, 2008)(J. Boyko)(granting motion to suppress), upon which the petitioner relies for the proposition that evidence seized consequent to the entry by police into a hotel room to get identification of an occupant is unlawful, is distinguishable from this case.  In that case the police went to a hotel room after there had been complaints indicating the possibility of a meth lab, and when a man answered the door they felt he was being evasive about his identification, they went into the room to pursue the issue further, after which they observed drug paraphernalia and both he and his girlfriend admitted that they each had outstanding warrants against them. The officers in that case went to the hotel with no permissible reason to enter the room. In the present case, the police went to the room with an arrest warrant for petitioner, arrested him, and consequent to that sanctioned arrest, questioned the other occupant of the room in an attempt to secure the area for the officers involved.

This claim for relief, having been decided on the merits in the state courts, is analyzed in accordance with the more deferential standard of review enunciated in AEDPA previously set forth herein.

In Blakely, the Court held that violations of the Sixth Amendment to the United States Constitution could be avoided if "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 301 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).  Although the Blakely case limited the authority of the trial judge to impose sentences in excess of the maximum provided by law, the authority of a sentencing judge to impose a sentence within the prescribed statutory range for a particular offense was not  limited in the same way.

In January of 2005 the United States Supreme Court held, in United States v. Booker, 543 U.S. 220, 245, 259 (2005), that the mandatory provisions of the United States Sentencing Guidelines were unconstitutional under the Blakely decision, but they could be used in an advisory manner.

The Ohio Supreme Court applied the Apprendi, Blakely, and Booker decisions to the Ohio sentencing guidelines, and held that parts of Ohio's felony sentencing scheme were unconstitutional, including Ohio Revised Code §§ 2929.14(B), 2929.19(B)(2), and 2929.41, which provide for judicial findings of fact in order to rebut presumptions in sentencing terms; §2929.14(C), providing for the imposition of maximum sentences;  §2929.14(D)(2)(b), findings for repeat violent offender; §2929.14(D)(3)(b), major drug offenders;

§2929.14(E)(4), providing for the imposition of consecutive sentences;[5] and §2953.08 (G), statutory findings for consecutive sentences in the appellate record.  State v. Foster, 109 Ohio St.3d 1, 62-67, 83, 845 N.E.2d 470 (2006).  The constitutional violation was premised upon the fact that those provisions require judicial findings of fact beyond those either rendered by the jury or admitted to by the defendant.  Ibid.  Those offending portions of the sentencing code were severed, *but trial courts retained full discretion to impose sentences within the statutory range while no longer being required to make findings of fact or to articulate reasons for imposing maximum or consecutive sentences*.  Id. at 100.  As the Court did in Booker, the Ohio Supreme Court determined that its holding in Foster was to be applied to any case pending on direct appeal, and that where sentences were found to have been constitutionally invalid remanding for re-sentencing was in order.

Challenges to the Booker[6] decision have been repeatedly denied by the federal courts. United States v. Barton, 455 F.3d 649, 657 (6th Cir. 2006), cert. denied, 127 S.Ct. 748 (2006); United States v. Davenport, 455 F.3d 366 (4th Cir. 2006); United States v. Austin, 432 F.3d 598, 599-600 (5th Cir. 2005); United States v. Vaughn, 430 F.3d 518 (2nd Cir. 2005), cert. denied, 547 U.S. 1060 (2006); United States v. Perez-Ruiz, 421 F.3d 11 (1st Cir. 2005), cert. denied, 546 U.S.  1120 (2006); United States v. Dupas, 419 F.3d 916, (9th Cir. 2005), cert. denied, 547 U.S. 1011 (2006); United States v. Jamison, 416 F.3d 538 (7th Cir. 2005)

---

[5]On January 14, 2009 the United States Supreme Court decided Oregon v. Ice, 555 U.S. ___, 129 S.Ct. 711, 2009 U.S. LEXIS 582 (2009), which abrogated this portion of the Foster decision and held that judicial factfinding to determine whether consecutive sentences should be imposed does not violate Apprendi/Blakely.  In so doing, the Court expanded the scope of judicial factfinding discretion in sentencing.

[6]Significant in light of the fact that the Foster and Booker decisions employed similar rationales to craft similar remedies.

("Jamison also had fair warning that distributing cocaine base was punishable by a prison term of up to twenty years, as spelled out in the United States Code. Jamison had sufficient warning of the possible consequences of his actions, and his sentence does not run afoul of any of the core concepts discussed in Rogers.")

In addition, challenges similar to that raised by the petitioner have also been rejected by judges in this district. Watkins v. Williams, Case No. 3:07CV1296 (N.D.Ohio June 17, 2008) (J. Adams) (The Foster decision did not violate due process as it did not alter the fact that the defendant was well aware of the maximum penalty he faced at the time of his crime.); Lyles v. Jeffreys, Case No. 3:07CV1315 (N.D.Ohio April 24, 2008) (J. Oliver) (The trial court's re-sentencing did not violate petitioner's Due Process right not to be re-sentenced pursuant to a law which violates the Ex Post Facto Clause, as petitioner "had fair notice of the acts that were prohibited and the degree of punishment which the Ohio legislature wished to impose on those who committed those acts."); McGhee v. Konteh, Case No. 1:07CV1408 (N.D.Ohio Feb. 1, 2008) (J. Nugent) (Affirming Magistrate Judge Limbert's conclusion that "Since the *Foster* decision does not change the elements necessary to convict Petitioner or the potential maximum sentence that Petitioner faced for a first degree felony, *Foster* does not raise an ex post facto-type due process violation. Moreover, the trial judge's application of *Foster* to Petitioner's case in particular did not violate *Apprendi* because he did not sentence Petitioner beyond the statutory maximum.")

The appellate court rejected petitioner's challenges to his sentence, holding in pertinent part:

24

Price argues that the trial court erred by imposing greater than the minimum sentence because it relied on facts only a jury could find.  This Court disagrees.

In *State v. Foster*, 109 Ohio St.3d 1, 2006 Ohio 856, 845 N.E.2d 470, the Ohio Supreme Court held that Ohio's sentencing structure was unconstitutional to the extent that it required judicial fact finding.  Id. at paragraphs one through seven of the syllabus.  In constructing a remedy, the Court excised the portions of the statute it found to offend the Sixth Amendment and thereby granted full discretion to trial court judges to sentence defendants within the bounds prescribed by statute.  See id.; *State v. Dudukovich*, 9th Dist. No. 05CA008729, 2006 Ohio 1309, at P19.

The U.S. Supreme Court took specific note that the exercise of this discretion, when not in the form of mandatory fact-finding, does not violate the Constitution.

> "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment.  We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range.  Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the SRA the provisions that make the Guidelines binding on district judges; it is that circumstance that makes the Court's answer to the second question presented possible. *For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.*"  (Emphasis added and internal citations omitted.)  *U.S. v. Booker* (2005), 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621.

25

> Accordingly, to the extent that the trial court may have relied upon certain facts which it found relevant, after *Foster*, Price had no right to a jury determination of those facts.  Price's second assignment of error, therefore, is overruled.

From the foregoing it is clear that the state appellate court held that there was no constitutional violation in petitioner's sentencing.  <u>Foster</u> did not change the potential maximum sentence that the petitioner faced if he committed the crime with which he was ultimately charged, nor did it change the elements necessary to convict him of that crime or deprive him of a defense which had been available at the time he committed the crimes.  In addition, he was informed that his sentence would fall within the proscribed ranges for crimes upon which he entered his plea.  Petitioner knew that any thought of receiving a minimum sentence he may have entertained prior to his sentencing was always vulnerable to change by the sentencing court.

To the extent that the petitioner argues that the severance remedy imposed by <u>Foster</u> is somehow parallel to that imposed by the California Supreme Court, the latter of which has been deemed unconstitutional by the United States Supreme Court in <u>Cunningham v. California</u>, 549 U.S. 270 (2007), this Court disagrees.  That argument was analyzed and rejected by another court within this district in pertinent part as follows:

> Finally, petitioner contends that in light of the Supreme Court's recent decision in *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856 (2007), "a state court cannot apply the *Booker* severance [remedy] to state statutes in the manner that the Ohio Supreme Court applied *Booker* to Ohio's sentencing statutes" in *Foster*. (Doc. 14, pp. 15-18).  The Court disagrees with this contention.

In *Cunningham*, 127 S.Ct. At 860, the Court evaluated the constitutionality of California's determinate sentencing law ("DSL"), under which an offense was punishable by one of three precise prison terms: a lower term of 6 years, a middle term of 12 years, or an upper term of 16 years.  Under the DSL, the trial judge was required to sentence to petitioner to the middle prison term "unless there [we]re circumstances in aggravation or mitigation of the crime" as determined by the court based on certain facts established by a preponderance of the evidence.  *See id*. at 861-62.  The Supreme Court held that "[b]ecause circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt,"...the DSL violates [the Sixth Amendment]" in light of *Apprendi*, *Blakely* and *Booker*.  *Id*. at 868.

The Court stated that "[w]hile '[t]hat should be the end of the matter'" under *Blakely*, the California Supreme Court had held otherwise in another case based on the determination that the upper term of the three-tier system, as opposed to the middle term, qualified as "the relevant statutory maximum," and therefore, the "operation and effect" of the DSL was to "simply authorize[] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within as statutorily prescribed sentencing range."  See id.  The Supreme Court stated that in so ruling, the California Supreme Court ultimately had "relied on an equation of California's DSL system to the post-*Booker* federal system," wherein the "level of discretion available to a California judge in selecting which of the three available terms to impose...appears comparable to the level of discretion that the high court has chosen to permit federal judges in post-*Booker* sentencing.  *Id*. at 869-70.

The Supreme Court held that contrary to the California Supreme Court's determination, "our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum."  *Id*. at 868, 871.  Moreover the Court found that the California Supreme Court's "attempted comparison [to the post-*Booker* federal system was] unavailing." *Id*.  The Court reasoned in pertinent

27

part:

> California's DSL does not resemble the advisory
> system the *Booker* Court had in view.  Under
> California's system, judges are not free to
> exercise their "discretion to select a specific
> sentence within a defined range."  *Booker*, 543
> U.S. at 233....Factfinding to elevate a sentence
> from 12 to 16 years, our decisions make plain,
> falls within the province of the jury employing a
> beyond-a-reasonable doubt standard, not the
> bailiwick of a judge determining where the
> preponderance of the evidence lies....

> ....Because the DSL allocates to judges sole
> authority to find facts permitting the imposition
> of an upper term sentence, the system violates the
> Sixth Amendment.  It is comforting, but beside
> the point, that California's system requires judge-
> determined DSL sentences to be reasonable.
> *Booker*'s remedy for the Federal Guidelines, in
> short, is not a recipe for rendering our Sixth
> Amendment case law toothless.

*Id*. at 870.

The Court went on to point out several states had modified
"their systems in the wake of *Apprendi* and *Blakely* to retain
determinate sentencing...by calling upon the jury-either at trial
or in a separate sentencing proceeding–to find any fact
necessary to the imposition of an elevated sentence."  *Id*. at 871.
The Court further noted: "Other States have chosen to permit
judges genuinely 'to exercise broad discretion...within a
statutory range,' which, 'everyone agrees,' encounters no Sixth
Amendment shoal."  *Id*. (quoting *Booker*, 543 U.S. at 233).

Here, as in *Booker*, and in contrast to *Cunningham*, Ohio's
challenged sentencing scheme permitted the trial court to
exercise discretion in the selection of an appropriate sentence

> within a range capped at a statutory maximum.  As the *Cunningham* Court indicated, by excising the provisions that rendered the scheme mandatory and thus permitting the sentencing court broad discretion to impose a sentence within the applicable statutory range, the *Foster* court adopted a remedy that, as in *Booker*, 542 [sic] U.S. at 233, "encounters no Sixth Amendment shoal."

Hooks v. Warden, Case No. 1:07CV0520 (Report and Recommendation of Magistrate Judge Timothy Hogan at 19-21)(Adopted by J. Beckwith on October 3, 2008).   Applying the foregoing to the instant case, the decision of the state appellate court that the trial court's sentencing did not violate the Sixth Amendment was in accordance with the decision of the Supreme Court in Cunningham.

As a consequence of the foregoing, petitioner has failed to show that the state appellate court decision upholding his sentencing resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, nor that the decision was based upon an unreasonable determination of the facts in light of the evidence presented.

It follows that petitioner's second claim for relief is without merit.

In light of all the foregoing it is concluded that no claim of constitutional violation has been presented requiring further proceedings prior to disposition on the merits.

It is, therefore, recommended that the petition be dismissed without further proceedings.

s/DAVID S. PERELMAN

United States Magistrate Judge

DATE:    August 7, 2009

## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).